___

SO ORDERED,

**Judge Katharine M. Samson**
United States Bankruptcy Judge
Date Signed: April 9, 2019

The Order of the Court is set forth below. The docket reflects the date entered.
___

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF MISSISSIPPI

| | |
|---|---|
| IN RE: MICHAEL T. LONG<br>JENNIFER LONG | CASE NO. 15-52052-KMS |
| | CHAPTER 7 |
| UNITED STATES TRUSTEE | |
| V. | ADV. PROC. NO. 17-06003-KMS |
| MICHAEL T. LONG AND<br>JENNIFER LONG | |

### OPINION AND ORDER ON UNITED STATES TRUSTEE'S COMPLAINT OBJECTING TO DICHARGE (Dkt. No. 1)

THIS MATTER is before the Court on the United States Trustee's Complaint Objecting to Discharge ("Complaint") of the Debtors, Michael T. Long and Jennifer Long ("Debtors"). Adv. ECF No. 1. The United States Trustee ("UST") alleges Debtors intended to hinder, delay, or defraud a creditor or officer of the estate by failing to disclose property of the estate in violation of 11 U.S.C. § 727(a)(2)(B) and knowingly and fraudulently made materially false oaths in connection with the case in violation of 11 U.S.C. § 727(a)(4). *Id*. ¶¶ 18-23. After trial, the matter was taken under advisement. Having considered the pleadings, evidence, testimony and applicable law, the Court finds that judgment should be entered in favor of the Debtors.

*Jurisdiction*

This Court has jurisdiction over the subject matter of and the parties to this proceeding under 28 U.S.C. § 1334. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(J).

*Factual and Procedural Background*

Michael Long ("Michael" or "Long") played football at the University of Southern Mississippi in the mid-1980s. Trial Tr., Adv. ECF No. 69 at 45. He did not graduate from college, but started his own business in 1989, engaging in various types of work that ultimately led to home construction and subdivision development. *Id.* at 45-46. Long planned to develop property on the Mississippi Gulf Coast, and in 2002, he purchased beachfront property on Highway 90 and Cowan Road in Gulfport, Mississippi (the "Cowan Road Property"). *Id.* at 46. PriorityOne Bank, the lender for the purchase, took a security interest in the Cowan Road Property. In the aftermath of the 2005 Hurricane Katrina, sewage lift pump stations were installed on the Cowan Road Property without Long's knowledge or consent. As a result, Long was not able to develop the property as he planned. *Id*. The Cowan Road Property is the subject of protracted litigation between Long and the City of Gulfport, the Harrison County Utility Authority, and others. *See In re Cowan Road and Highway 90, LLC*, No. 15-52053, ECF No. 45 at 2 (Bankr. S.D. Miss. filed Dec. 14, 2015). After several years of litigation and after PriorityOne commenced foreclosure proceedings on the Cowan Road Property, the Longs, on advice of counsel, sought bankruptcy protection. Tr. at 10-13.

On December 14, 2015, the Longs filed a joint voluntary petition for relief under chapter 11 of the Bankruptcy Code. *Id.* at 13; ECF No. 1. On the same day, Long filed Chapter 11 petitions for two business entities he owned, Cowan Road and Highway 90, LLC; and Michael Long Home Construction Plus, LLC. *In re Cowan Road and Hwy 90, LLC,* No. 15-52053-KMS (Bankr. S.D. Miss. filed Dec. 14, 2015); *In re Michael Long Home Construction Plus, LLC,* No. 15-52054-KMS

(Bankr. S.D. Miss. filed Dec. 14, 2015). The UST ultimately filed a Motion to Convert or Dismiss the Longs' chapter 11 case and on September 30, 2016, the case was converted to chapter 7. Order, ECF No. 157.

On January 9, 2017, the UST filed his Complaint alleging that the Longs failed to disclose in their bankruptcy schedules Michael's ownership interest in Longwood Townhomes, LLC, and a related debt owed to David L. Dearman, Long's former business associate. Complaint, ¶¶ 19, 21, Adv. ECF No. 1. The UST also alleged that the Debtors made false oaths at their § 341 meetings of creditors by testifying that their bankruptcy documents were true and correct. *Id.* ¶ 23. The Longs, unrepresented by counsel in the adversary proceeding, filed an answer. Adv. ECF No. 6. They denied owing the debt to Dearman and asserted that they were advised by counsel not to list Longwood Townhomes, LLC, in their schedules. *Id.* ¶¶ 9-12. The Longs asserted that they did not intend to withhold any information from their attorney or the Court, or to defraud a creditor or to conceal property. *Id.* ¶¶ 15. 19. The Longs further asserted that they felt they answered questions under oath at their §341 meetings out of ignorance. *Id.* ¶ 23. They also stated that they were financially unable to pay additional fees to counsel to amend the schedules. *Id. ¶* 16.

At trial, the UST produced evidence and testimony of additional debts and interests not disclosed in the bankruptcy schedules and statements, including Long's guaranty of an obligation owed by Longwood Townhomes, LLC, to First Southern Bank and ownership interests in several other LLCs listed on the Mississippi Secretary of State's website. The evidence did not show that the additional LLCs owned assets or were conducting business at the time the Longs filed their bankruptcy petition.

*Stipulated Facts*

The pretrial order contains the following stipulated facts. *See* Adv. ECF No. 66, Stips. 1-30.

1. On December 14, 2015, the Debtors filed a joint voluntary chapter 11 petition and the case was converted to chapter 7 on September 30, 2016. *Id.,* Stip. 1. The Debtors reviewed their petition before it was signed and filed on December 14, 2015. *Id.,* Stip. 2. The Debtors reviewed their schedules and statements before they signed them under penalty of perjury and before they were filed on January 19, 2016. *Id.,* Stips. 3, 5.

2. Long owned a 49% interest in Longwood Townhomes, LLC prior to the bankruptcy that was not disclosed in the schedules and statements filed on January 19, 2016. *Id.,* Stips. 6,7.

3. On May 29, 2015, prior to the bankruptcy, Dearman and Long entered into a limited liability company agreement as the members of Longwood Townhomes, LLC. Exhibit "A" to the agreement listed Dearman with a 51% membership interest and Long with a 49% membership interest. *Id.,* Stip 11.

4. On June 1, 2015, Long, as a member of Longwood Townhomes, LLC, signed a promissory note to First Southern Bank. *Id.,* Stip 13. Long also signed a personal guaranty of the loan. *Id.,* Stip. 14. First Southern Bank filed a proof of claim on February 24, 2016. *Id.,* Stip. 16.

5. On June 1, 2015, Long signed a promissory note to Dearman for $182,027.00 related to Longwood Townhomes, LLC. *Id.,* Stip 12.

6. The Debtors' schedules and statements failed to disclose Long's ownership interest in Longwood Townhomes, Phase I, LLC; Longwood Townhomes, Phase II, LLC; and in Crown's Point, LLC, a company that was dissolved in 2013. *Id.,* Stips. 8-10. Their schedules also failed to disclose Long's debts to Dearman and to First Southern Bank. *Id.,* Stips. 20, 21.

7. The UST designee conducted the chapter 11 § 341 meeting of creditors on January 27, 2016. *Id.,* Stip 4. The Debtors testified that they signed their petition, schedules, and statements; testified to their truth and accuracy; and testified that they disclosed all assets and creditors and that they were unaware of errors or omissions. *Id.,* Stip. 15.

8. On June 30, 2016, Dearman filed a Motion to Authorize Debtor to Relinquish and Transfer LLC Interest in Exchange for Release of Liability, stating that Long owned a 49% interest in Longwood Townhomes, LLC. *Id.,* Stip. 17. The motion stated that Longwood Townhomes, LLC, owns a thirty-nine-unit apartment complex in Laurel, Mississippi,[1] with a fair market value of $2,200,000 and a first deed of trust in favor of First Southern Bank with a payoff in excess of $2,400,000. *Id*. In their response filed July 21, 2016, the Debtors admitted that Long owned the 49% interest, that Longwood Townhomes, LLC, owns the apartment complex, that there is a deed of trust in favor of First Southern, that Long is guarantor on the note, and that Long owes Dearman $185,196.08. *Id.,* Stip. 18.

9. On September 30, 2016, the Court entered its Order converting the chapter 11 case to chapter 7 on multiple grounds under § 1112(b). *Id.,* Stip. 22.

10. After conversion, the Debtors testified at their chapter 7 § 341 meeting of creditors, conducted by the chapter 7 trustee that the petition, schedules and statements were true and accurate; that they read and signed the documents and they were true and correct; that there was an issue regarding the apartment complex and Dearman. *Id.,* Stip. 23. The trustee requested that the Debtors amend their schedules by November 30, 2016, to disclose the ownership interest in Longwood Townhomes, LLC. *Id.*

---

[1] Laurel and Ellisville, Mississippi, are located in close proximity. The parties have referred to the same thirty-nine-unit apartment complex, although sometimes referring to the location in Laurel and other times in Ellisville.

11. On January 9, 2017, the UST filed his complaint objecting to Debtors' discharge. *Id.,* Stip. 24.

12. On September 5, 2018, Debtors filed an Amended Schedule A/B that disclosed the 49% ownership interest in Longwood Townhomes, LLC, and an Amended Schedule E/F that disclosed debts to Dearman in the amount of $185,196.08[2] and to First Southern Bank in the amount of $2,400,000.00. *Id.,* Stip. 30.

### *The Trial*

### *Testimony of Michael Long*

Long testified that he Jennifer first met with Craig Geno, their bankruptcy attorney, in December 2015. Tr. at 9-13. Long did not know anything about bankruptcy and had been referred to bankruptcy counsel. *Id.* at 12. Geno and the Longs discussed Michael's businesses, everything he owned, and ongoing litigation over and potential foreclosure of the Cowan Road Property. *Id.* at 10-11. He said the discussions included the two businesses that also filed for bankruptcy protection as well as Longwood Townhomes. *Id.*

Counsel for the UST questioned Long about several businesses that did not appear on the Longs' bankruptcy schedules: Crown's Point, LLC; Longwood Townhomes, Phase I, LLC; Longwood Townhomes, Phase II, LLC; Longwood Townhomes, LLC; Heatherwood Utilities, LLC; Island View Development, LLC; and Herring-Long Investments, LLC.

Crown's Point, LLC, formed in 2011, was the name of a subdivision that had been financed by an investor. *Id.* at 14-16, 54-55. After two years, the investor took over the subdivision. *Id.* at 14-15. Long could not remember whether he told Geno about Crown's Point, LLC, and stated that it was "just an LLC name." *Id.* at 15.

---

[2] The Dearman debt was listed as disputed, unliquidated and contingent. ECF No. 266 at 12.

Longwood Townhomes, Phase I, LLC, and Longwood Townhomes, Phase II, LLC, were created in 2011. *Id.* at 20. The LLCs owned an apartment complex Long built in 2010, one owning twenty-five units and the other owning fourteen for a total of thirty-nine units. *Id.* at 16-20, 52. The apartments were collateral for loans with First Southern Bank and Community Bank. Settlement Statement, Trial Ex., UST-10, ECF No. 62-2 at 26-27; Tr. at 53, 89. Long rented most of the apartments to Halliburton. Tr. at 16. In 2012, Halliburton withdrew, causing Long to need help paying the debt. *Id.* at 16-17. Heath Herring, Long's accountant and good friend, agreed to partner with Long. However, Long's banker arranged for Dearman to partner with Long instead. *Id.* at 17, 30-31, 52, 56. Long testified that he did not receive any income from the apartments once Dearman got involved. *Id.* at 16-17, 52. Phase I and II became Longwood Townhomes, LLC, and title to the property was transferred to the new LLC with Dearman as the 51% owner. *Id.* at 17-18, 53. When asked about whether he told Geno of the existence of the Phase I and Phase II LLCs, Long stated "that was a long time ago," and the deal with Dearman was already done when he first met with Geno, so the Phase I and II LLCs did not own the apartments any more. *Id.* at 20-21.

Long acknowledged that Heatherwood Utilities, LLC, is a sewer utility listed in good standing with the Mississippi Secretary of State. *Id.* at 23, 25. It was formed to install an absorption bed for sewage in Heatherwood subdivision, one of Long's developments. *Id.* at 46-47. After the bed was installed, the subdivision was sold to a new developer. *Id.* at 23, 47-48. Long has renewed the LLC with the intention of doing business, but said it has never conducted business since it was formed in 2007. *Id.* at 25, 48. He kept renewing the LLC because "it took a lot of money to get it together," around $8,000.00. *Id.* at 25. Long did not think he told Geno about Heatherwood. *Id.* at 25-26.

Long acknowledged that he created Island View Development, LLC, in 2011, but said that it never owned any properties. *Id.* at 26-27. Long intended to use the Island View name in connection with the development of the Cowan Road Property. *Id.* at 50. He said that he "worked for years and years and years trying to get that approved. Then it all got shot down when they came in and shot all the sewers through my property and all that." *Id.* at 50.

Herring-Long Investments, LLC, never did any business. *Id.* at 28-29, 51. Long explained that the LLC was set up for his friend Herring to buy the thirty-nine-unit apartment complex but that the sale never happened. He acknowledged that the Herring-Long company is listed as dissolved. *Id.* at 29. He did not tell Geno about its existence. *Id.*

Long acknowledged that he owned a 49% interest in Longwood Townhomes, LLC, when he filed his personal bankruptcy. *Id.* at 33. He also testified that he told Geno about the existence of Longwood Townhomes and the deal with Dearman. *Id.* at 32. He stated that he and Jennifer brought a list of assets to Geno and went over it with him and that the apartment complex was on the list. *Id.* at 34-36; Trial Ex. UST-5, ECF No. 62-1 at 17-18. Long said he informed Geno of the debt owed by Longwood Townhomes to First Southern Bank but did know know whether he told him of his personal guaranty. Tr. at 40. He said he told Geno that "the loan was . . . with a very rich partner and . . . it was not in trouble." *Id.* When asked whether he told Geno that he had signed a note to Dearman, he said he did not remember if he had discussed it, stating, "I didn't owe it." *Id.* at 42. Long testified that the obligations in the Dearman note were included in the First Southern Bank loan and that Dearman had admitted as much. *Id.* at 41-42. He said that "they just pressured me into signing [the Dearman note], and I was sitting there thinking I was going to lose everything . . . I've already lost everything. We have nothing left." *Id.* at 42-43.

When asked why he did not list the other LLCs the UST found on the Secretary of State's website, Long said he understood they were only filing the three bankruptcies, and he knew the other LLCs did not own any property but were just names that he paid $50 a year to keep. *Id.* at 49-50. Long was also asked about the applications for reinstatement of dissolved LLCs and he stated that he and Jennifer were just trying to keep the names, explaining that they "did that with several of them for years." *Id.* at 19, 54.

Long further testified that he has not tried to hide anything and that there wasn't anything to hide. *Id.* at 44. He testified, "We didn't intentionally do anything. If something had been wrong, we didn't do it on purpose . . . . I didn't know what I was getting into. And we've paid for counsel.[3] We don't know why we're in trouble . . . ." *Id.* at 60. Long added that he had recently suffered a series of strokes from high blood pressure and lost vision in one eye. *Id.*

### *Testimony of Jennifer Long*

Jennifer Long testified that they were told before meeting with Geno to write down all they had—assets, account numbers, and amounts owed—and that she prepared the list of assets, including Longwood Townhomes. *Id.* at 87-88. She said that they "were honest about everything . . . and the reason we hired an attorney is because we knew nothing about bankruptcy, so we relied on someone that did know it to help us." *Id.* at 88.

### *Testimony of Craig Geno*

Geno testified about discussions he had with the Longs relating to their businesses, assets and liabilities. He said that his normal office procedure is to have an initial interview with clients at which he asks them to tell "their story, who they are, how they got started, what got them in

---

[3] Disclosures in the three related bankruptcies indicate that the Longs paid Geno approximately $30,000 in attorney's fees before the cases were filed. *In re Long,* No. 15-52052-KMS, ECF No. 14; *In re Cowan Road and Highway 90, LLC,* No. 15-52053-KMS, ECF No. 21; *In re Michael Long Home Construction Plus, LLC,* No. 15-52054-KMS, ECF No. 14.

trouble, what they've done to get out of trouble, and [what] assets and liabilities that they own and owe." *Id.* at 62-63. He said that the initial meeting with the Longs was a typical meeting but that Michael was "extremely agitated about his situation." *Id.* at 63. Geno stated that "what happened to him was absolutely no fault of his own about the county or the city, or whoever it was, misplacing the improvement on his property." *Id.* Geno further stated that Long was "extremely confused about what he owned, what he owed, who he owed, what assets had been parked where and then a number of deals and transactions that he had made to try to work himself out of the debt problems that he had incurred." *Id.*[4]

Geno met several times with the Longs. *Id.* at 64-65. Discussions centered around the Cowan Road Property and related litigation. *Id.* at 64, 66. They also discussed the pre-petition deals and arrangements by which Long had tried to restructure his debt and avoid bankruptcy. *Id.* at 64. Geno said that Long believed he had been tricked into pledging a lot of unencumbered collateral in connection with the PriortyOne Bank loan, and when things took a turn, PriorityOne began foreclosing. *Id.* at 66-67. Geno stated that "in my mind, at least, [Long was] understandably disappointed and angry about that." *Id.* at 67.

When recalling discussions about Longwood Townhomes, Geno referred to notes he made at the initial meeting with the Longs on December 8, 2005. *Id.* at 67-69. He stated that:

> Asset Number 5 just says partner pays debt, traditionally Halliburton employees there, 31 apartments in December went vacant. Then he went to Mr. Dearman about a note at three percent to work out the debt.
>
> My recollection after reflecting on this and especially after hearing Mr. Long's testimony today is that he believed that he had transferred that apartment complex. Mr. Long was never troubled with technical titles to property. That just didn't really mean that much to him, but he had transferred a while back that apartment complex to this Mr.

---

[4] Geno told the Court that his associate attended the first 341 meeting with the Longs and told him that counsel for PriorityOne "knew more about the Longs' assets and where they belonged and how they were titled than Mr. and Mrs. Long actually did and that [counsel for PriorityOne] actually did more testifying at that meeting than Mr. and Mrs. Long did." *Id.* at 93.

> Dearman fellow in exchange for Mr. Dearman taking it over and running it. He thought, according to my notes, that it was in some sort of partnership.
>
> He did not mention the debt on the apartment complex specifically, except that he said it was worth about the amount of the debt, and he did mention that Mr. Dearman had taken over the operations, that he was paying the note, that he had collected a significant amount of rent, but I really think Mr. Long in his own mind thought he was out of that.

*Id.* at 68-69.

Geno said that the name "Longwood Townhomes, LLC" had not come up in the meeting, although the apartment complex was discussed. *Id*. at 69. Responding to questions from the UST's attorney, Geno further stated, "[I]f I believed that Mr. Long had divested himself of any interest in [the apartment complex] a while back, I probably could have easily said, then if you don't own in [sic] it or have any interest in it, you don't need to list that." *Id* at 69-70.

Geno testified that the Longs did mention a bank debt on the apartment complex but not Long's guaranty to First Southern Bank. *Id* at 74. Geno also stated that the Longs did not specifically mention the debt to Dearman or of the existence of Crown's Point, LLC; the Phase I or Phase II of Longwood Townhomes LLCs; Heatherwood Utilities, LLC; Island View Development, LLC; or Herring-Long Investments, LLC. *Id* at 75-76. In reference to the Crown's Point, LLC, Geno reflected, "[S]ince it was dissolved, I probably made the decision not to list it in the schedules, not them." *Id*. at 85.

Geno also testified that he did not find in his files a copy of the list of assets the Longs said they showed him. *Id.* at 78. He thought he would have remembered seeing it, especially because the valuations listed in it would have been pertinent to valuation of Debtors' assets. *Id*. He also testified that he would have never told the Longs, or any other debtor, they did not have to disclose all their assets and liabilities in their personal bankruptcy case. *Id.* at 81-82. Geno added, "[In] my experience debtors who are trying to hide something don't hide assets that are listed in the public

records, they're smarter than that, and the Longs are not stupid by any stretch of the imagination, but I don't think they were trying to hide anything from anybody either." *Id.* at 86.

*Analysis*

*Chapter 7 Discharge*

"The purpose of Chapter Seven of the Bankruptcy Code is to give individual debtors a 'fresh start,' and the heart of this goal is embodied in § 727's discharge provisions." *Ichinose v. Homer Nat'l Bank (In re Ichinose),* 946 F.2d 1169, 1172 (5th Cir. 1991). Discharge of a debtor is required under the Bankruptcy Code unless a statutory exception applies. *The Cadle Co. v. Duncan (In re Duncan),* 562 F.3d 688, 695 (5th Cir. 2009). "The exceptions are construed strictly against the creditor and liberally in favor of the debtor." *Id.* Denial of discharge is "considered an extreme remedy" that should be "imposed only upon those debtors who have not been honest and forthcoming about their affairs and therefore have not fulfilled the duties of full disclosure required of a bankruptcy debtor." *Wellmon v. Vigil (In re Vigil)*, No. 16-41463, Adv. No. 16-4107, 2017 WL 4773108, at *5 (Bankr. E.D. Tex. Oct. 18, 2017). The UST bears the burden of proof to establish that Debtors are not entitled to discharge. *Cadle Co v. Pratt (In re Pratt),* 411 F.3d 561, 565 (5th Cir. 2005) (plaintiff bears burden of establishing elements that prevent discharge); Fed. R. Bankr. P. 4005 ("At the trial on a complaint objecting to a discharge, the plaintiff has the burden of proving the objection.").

*Section 727(a)(2)(B)*

The court shall grant a discharge unless "the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed . . . property of the estate, after the date of the filing

of the petition." 11 U.S.C. § 727(a)(2)(B). Actual intent, required to support a denial of discharge, "may be inferred from the actions of the debtor and may be proven by circumstantial evidence." *Pavy v. Chastant (In re Chastant),* 873 F.2d 89, 91 (5th Cir. 1989) (discussing intent under § 727(a)(2)(A)).

However, "[e]vidence that demonstrates confusion or a believable lack of understanding on the part of the Debtors may militate against an inference of fraudulent intent." *First Bank v. Adams (In re Adams)*, No. 12-02569-NPO, Adv. No. 14-00046-NPO, 2015 WL 1876669, at *11 (Bankr. S.D. Miss. Apr. 22, 2015) (citation omitted). And concealed property that is "of small value . . . tends to negate fraudulent intent." 6 *Collier on Bankruptcy* ¶ 727.02[3][b] (Richard Levin & Henry J. Sommer eds., 16th ed.); *Robertson v. Dennis (In re Dennis),* 330 F.3d 696, 702 (5th Cir. 2003) (low value of assets is one factor to consider in determination of debtor's intent to defraud). Likewise, "[a] transfer of the debtor's property is not made with intent to hinder, delay or defraud a creditor under section 727(a)(2)(A) if the property is subject to a security interest and the debtor has no equity in it." 6 *Collier on Bankruptcy* ¶ 727.02[3][b]. Ultimately, a determination of intent is largely based on the bankruptcy court's assessment of a debtor's credibility. *In re Adams*, 2015 WL 1876669, at *11; *see also Wiggains v. Reed (In re Wiggains),* 848 F.3d 655, 663 (5th Cir. 2017) ("Deference to the bankruptcy court's findings is particularly appropriate on the issue of intent. Such a determination often depends on assessing a debtor's credibility."); *Tex. Mortg. Servs. Corp. v. Guadalupe Sav. & Loan Ass'n (In re Tex. Mortg. Servs. Corp.)*, 761 F.2d 1068, 1078 (5th Cir. 1985) ("We will not attempt to reassess the credibility of witnesses whom we have not had an opportunity to see on the stand.").

The UST has established that Debtors did not schedule certain assets including Michael Long's interest in Longwood Townhomes, LLC, as well as his interest in the other LLCs discussed

above. However, the UST has not established that these omissions were with intent to hinder, delay or defraud a creditor or officer of the estate.

The testimony established that Long was confused and distraught about his financial situation and that he did not understand the bankruptcy process and what was required, all of which led him to hire bankruptcy counsel. The Longs and Geno agree that the apartment complex owned by Longwood Townhomes, LLC, was discussed at their initial meeting in December of 2015. Michael's statements to Geno that the apartment debt was being paid by someone else and that he was no longer running the business contributed to Geno's assessment that there was no need for the apartments to be scheduled.

The Debtors presented credible evidence that they had done their best to disclose all their assets. The testimony established a misunderstanding and failure to communicate about the apartment complex, the related debt and other alleged assets, but not an intent to defraud. The fact that there was no equity in the apartment complex for the benefit of the Longs further evidences no benefit to them from any concealment and a lack of intent to defraud.[5] Likewise, there was no evidence presented to show value in the other LLCs. The Court finds that the burden has not been met to establish an exception to discharge under § 727(a)(2)(B).

*Section 727(a)(4)(A)*

The court shall grant discharge unless "the debtor knowingly and fraudulently, in or in connection with the case . . . made a false oath or account." 11 U.S.C. § 727(a)(4)(A). "Any debtor who files a Chapter 7 petition has a continuous, affirmative duty to disclose the following in a complete and accurate manner: (a) a list of creditors; (b) schedules of assets, liabilities, current

---

[5] The Court notes that even though First Southern Bank was not listed in the schedules, the bank filed a proof of claim within two months after the case was filed and approximately six weeks before the proof of claim deadline. The bank's claim contained the guaranty agreement as well as the Longwood Townhomes, LLC, note signed by Long and Dearman.

income, and current expenditures; and (c) a statement of financial affairs." *Gebhardt v. Gartner (In re Gartner)*, 326 B.R. 357, 367 (Bankr. S.D. Tex. 2005) (citing *Browning Mfg. v. Mims (In re Coastal Plains, Inc.)*, 179 F.3d 197, 208 (5th Cir.1999)). "False oaths sufficient to justify the denial of discharge include '(1) a false statement or omission in the debtor's schedules or (2) a false statement by the debtor at the examination during the course of the proceedings.'" *Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174, 178 (5th Cir. 1992) (quoting 4 *Collier on Bankruptcy* ¶ 727.04[1], at 727-59 (15th ed. 1992)); *see* Fed. R. Bankr. P. 1008 ("All petitions, lists, schedules, statements and amendments thereto shall be verified or contain an unsworn declaration as provided in 28 U.S.C. § 1746.") The plaintiff bears the burden of proof under § 727(a)(4):

> To prevail on a claim under this subsection, an objecting plaintiff (a creditor or the trustee) must prove by a preponderance of the evidence "that (1) the debtor made a . . . statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement was material to the bankruptcy case."

*Judgment Factors, L.L.C. v. Packer (In re Packer)*, 816 F.3d 87, 94 (5th Cir. 2016) (quoting *In re Duncan*, 562 F.3d at 695).

"Circumstantial evidence may be used to prove fraudulent intent and the cumulative effect of false statements may, when taken together, evidence a reckless disregard for the truth sufficient to support a finding of fraudulent intent." *Schott v. Sirico (In re Sirico)*, No. 16-11028, Adv. No. 17-1042, 2018 WL 4378653, at *6 (Bankr. M.D. La. Sept. 12, 2018) (quoting *In re Duncan*, 562 F.3d at 695). A pattern of delay or failure to amend schedules may also indicate fraudulent intent. *The Cadle Co. v. Guenther (In re Guenther)*, 333 B.R. 759, 768 (Bankr. N.D. Tex. 2005) (court found under totality of facts that debtor's extended delay in amending schedules and statement of financial affairs added to pattern of withholding information and of fraudulent intent).

Not every misstatement or omission in the schedules constitutes a false oath. As one court has noted,

> Section 727(a)(4) does not, however, operate to penalize debtors for honest mistakes or misstatements. To be sure, courts acknowledge that petitions, schedules, and statements are often filed hastily, memories fail, and innocent mistakes and omissions can occur, and will be understanding of that reality so long as the evidence does not reveal an underlying intent to deceive.

*Wellmon v. Vigil (In re Vigil)*, 2017 WL 4773108, at *9 (quoting *Webb v. Isaacson (In re Isaacson)*, 478 B.R. 763, 783–84 (Bankr. E.D. Va. 2012)). 6 *Collier on Bankruptcy* ¶ 727.04[1][a] ("a false statement resulting from ignorance or carelessness is not one that is knowing and fraudulent"); *Schmidt v. Cantu (In re Cantu),* No. 08-70260, Adv. No. 09-7018, 2011 WL 672336, at *6 (Bankr. S.D. Tex. Feb. 17, 2011) (schedules and statement of financial affairs are not required to be perfect and court can consider reasonable explanations with respect to errors). "Honest mistakes due to ignorance, confusion or inadvertence will not establish that a debtor knowingly or fraudulently made a false oath." *Hampton v. Young (In re Young),* 576 B.R. 807, 816 (Bankr. E.D. Pa. 2017); *see also Cobb v. Singh (In re Singh),* 433 B.R. 139, 159 (Bankr. E.D. Pa. 2010) (court found after observing debtor over course of trial and considering circumstances that omission of ownership interests was "more likely attributable to confusion, ignorance or mistake, rather than fraudulent intent.")

In evaluating a debtor's knowledge of a false statement, consideration may be given to "the debtor's education, business experience and reliance on counsel." *Ne. Alliance Fed. Credit Union v. Garcia (In re Garcia)*, 260 B.R. 622, 631 (Bankr. D. Conn. 2001). Regarding reliance on counsel, "*[i]t may be that a debtor's description of the transaction caused his attorney to improperly analyze the transaction* but absent evidence that the debtor attempted to mislead his

counsel, the requisite intent cannot be inferred from the failure to disclose." *Harris v. Dawley (In re Dawley)*, 312 B.R. 765, 787 (Bankr. E.D. Pa. 2004) (emphasis added).

Whether an omission is material is not solely based on value of the asset omitted or on whether it was detrimental to creditors. *In re Duncan,* 562 F.3d at 695. The subject matter of a false oath is material "if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." *In re Beaubouef,* 966 F.2d at 178.

The UST has established that the Longs made statements under oath that were false. *See* Adv. ECF No. 66, Stips. The Longs signed their schedules and statements under penalty of perjury and also appeared under oath at their § 341 meetings, attesting that the schedules were true and correct. It is undisputed that the Longs failed to disclose the guaranty owed to First Southern Bank, the debt to Dearman, and the interests in the Longwood Townhomes LLCs and other LLCs on file in the Secretary of State's records. The omissions are material in that they bear a relationship to the Longs' business or estate, business dealings or existence and disposition of property.

However, the burden has not been met to show that the Longs knew the statements or omissions were false or that the statements were made with fraudulent intent. The testimony of the Longs and Geno indicates that there was a misunderstanding between them leading to the failure to disclose Michael's interest in Longwood Townhomes, LLC, and the related debts. In light of the evidence and the testimony at trial, the Court views this failure as an honest mistake due to confusion or inadvertence on the part of the Debtors. In addition, Long did not believe that he owed a debt to Dearman and asserts that Dearman has admitted as much. As for the additional LLCs that were not included in the Longs' schedules and statements, the testimony showed that

the LLCs did not do any business, own any assets, or were dissolved, resulting in the Longs' erroneous assumption that they were not relevant to the bankruptcy.

It is critical for a debtor to schedule all assets and all debts, even if disputed or contingent. *See Edwards v. Zemek (In re Zemek),* No. 09-15265-JDW, Adv. No. 11-01012-JDW, 2013 WL 4677879, at *6 (Bankr. N.D. Miss. Aug. 30, 2013) (purpose of § 727(a)(4) is to assure adequate information is available without need of examinations or investigations to determine whether information provided is true). And the Debtors and their attorney failed to amend the schedules to reflect Long's interest in the Longwood Townhomes, LLC, and the debt associated with the complex even after the omissions were discovered. This failure was one factor the Court considered in ordering the conversion of Debtors' chapter 11 case to a case under chapter 7.[6] But, under the particular circumstances here, the Court does not find this failure to indicate fraudulent intent to conceal assets or debt.

### *Conclusion and Order*

The Court finds that the UST has not met the burden under § 727(a)(2)(B) or § 727(a)(4)(A) to establish an exception to discharge. The relief requested in the Complaint should be denied.

IT IS THEREFORE ORDERED AND ADJUDGED that the relief requested in the Complaint is DENIED.

IT IS FURTHER ORDERED that the Debtors and counsel are instructed to amend the chapter 7 schedules within fourteen days of entry of this order to list all LLCs in which the Longs hold an interest.

##END OF ORDER##

---

[6] After ruling on the motion to convert, the Court learned that counsel representing the Longs at the hearing, Geno's associate, did not attend the initial meetings with the Debtors and therefore could not explain to the Court the absence of Longwood Townhomes, LLC, and the related debt from the schedules. Tr. at 92-94.